# In the United States Bankruptcy Court
## for the
### Southern District of Georgia
#### Savannah Division

**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By DReese at 3:43 pm, Feb 07, 2017

|  |  |
|---|---|
| In the matter of: ) | Chapter 7 |
| ) | |
| LESLIE KYRIN DUNSTON, ) | Number 14-41799-EJC |
| ) | |
| *Debtor*. ) | |
| ————————————————— ) | ————————————————— |
| ) | |
| BENJAMIN ROACH, ) | |
| CHAPTER 7 TRUSTEE, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | Adversary |
| v. ) | |
| ) | Number 15-04048-EJC |
| SKIDMORE COLLEGE ) | |
| ) | |
| *Defendant*. ) | |

## AMENDED[1] MEMORANDUM OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this adversary proceeding, the Chapter 7 Trustee, Benjamin Roach (the

"Trustee"), seeks to avoid and recover, as fraudulent transfers pursuant to 11 U.S.C. §§

548(a)(1)(B) and 550, three payments that the Debtor made to Defendant Skidmore College

("Skidmore"). The Debtor made these payments to pay for her daughter's tuition and other

costs of attendance at Skidmore. Central to the Court's analysis of these transfers is the fact

---

[1] Pursuant to Federal Rule of Civil Procedure 60, which is made applicable by Federal Rule of Bankruptcy Procedure 9024, the court "may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." Fed. R. Civ. P. 60(a). The Court is amending its Memorandum Opinion on Defendant's Motion for Summary Judgment (adv. dckt. 51) to add a statement of jurisdiction, which was omitted by mistake.

⌐AO 72A
(Rev. 8/82)

that in 2004 the Debtor established 529 plans for her two children from which to pay such college expenses. Pending before the Court is the Motion for Summary Judgment (the "Motion") (adv. dckt. 28) filed by Skidmore on July 5, 2016. For the reasons stated in this opinion, the Court will grant Skidmore summary judgment as to the July 25, 2013 and December 20, 2013 transfers, but deny summary judgment as to the September 2, 2014 transfer.

## I. JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(H).

## II. UNDISPUTED FACTS

### A. Procedural History

The debtor in this case, Dr. Leslie Kyrin Dunston ("Debtor"), is a medical doctor specializing in obstetrics and gynecology. (Adv. Dckt. 29, ¶ 3) From approximately 1997 to 2014, the Debtor was engaged in private practice as the owner of WomanCare Obstetrics & Gynecology, PC ("WomanCare") and True Balance MD, PC ("True Balance"). *Id.* at ¶ 4. On October 28, 2014, the Debtor filed for Chapter 7 bankruptcy relief due to an acute cash-flow shortage that occurred when her medical practices experienced difficulty collecting reimbursements from medical insurance companies for services performed. *Id.* at ¶ 9.

On October 14, 2015, the Trustee filed this adversary proceeding seeking to

avoid three payments made by the Debtor to Skidmore for her daughter's tuition and other costs of attendance. (Adv. Dckt. 1). In his Complaint, the Trustee alleges that the three transfers to Skidmore are all avoidable and recoverable pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550. *Id.* On December 17, 2015, Skidmore filed its Answer to the Trustee's Complaint. (Adv. Dckt. 8). In its Answer, Skidmore admits that it received the three payments at issue via checks purporting to be signed by the Debtor. *Id.* at ¶ 7. However, Skidmore asserts that the Trustee's Complaint fails to state a claim because the Trustee cannot meet his burden of proof as to each of the elements of § 548(a)(1). *Id.*

After the parties exchanged discovery, Skidmore filed the instant Motion on July 5, 2016 seeking summary judgment with respect to each of the payments it received from the Debtor. (Adv. Dckt. 28). In its Motion, Skidmore asserts again that the Trustee has not met his burden of proof on each element of his constructive fraudulent transfer claims. In support of its Motion, Skidmore filed an affidavit of the Debtor (adv. dckt. 29) and attached several documents in support, including the Debtor's November 12, 2013 personal financial statement, the Debtor's 2012 federal and state tax returns, the Debtor's bankruptcy petition, schedules and statement of financial affairs, and the 2012, 2013 and 2014 year-end statements for the Debtor's 529 plans.

On July 26, 2016, the Trustee filed a Response to Skidmore's Motion for Summary Judgment (adv. dckt. 33) and attached the Debtor's 2013 personal financial statement, the Debtor's 2012 and 2013 federal and state tax returns, the 2016 Chatham County Board of Assessors Property Record Card for the Debtor's real properties, and a portion of the Debtor's bank statements corresponding to the date of each payment to

Skidmore. After a request by Skidmore (adv. dckt. 36), the Court held oral argument on the Motion on September 22, 2016. Upon conclusion of the hearing, the Court took the matter under advisement.

B. The Transfers

In the fall of 2013, the Debtor's daughter, Chloe Dunston, enrolled at Skidmore College, a small liberal arts college located in Saratoga Springs, New York. To pay for Chloe's tuition and other costs of attendance, the Debtor made the following payments to Skidmore totaling $87,807.00:

| Date | Amount |
|------|--------|
| July 25, 2013 | $29,233.00 |
| December 20, 2013 | $28,603.00 |
| September 2, 2014 | $29,971.00 |

(collectively, the "Transfers") (Adv. Dckt. 33, Ex. A). All three of these payments were made from the Debtor's personal checking account. *Id.* However, as will be addressed below, Skidmore contends that the funds it received from the Debtor were comprised of funds withdrawn from the 529 plans established by the Debtor.

C. The 529 Plans

In 2004, the Debtor established separate qualified tuition savings plans under 26 U.S.C. § 529 (the "529 Plans") for her two children, Chloe and Julian Dunston[2]. From 2012 to 2014, the 529 Plans reflected the following balances:

---

[2] Throughout its pleadings, Skidmore makes reference only to the 529 plan (singular) established for Chloe Dunston. *See, e.g.* Adv. Dckt. 28, ¶ 3. However, the year-end statements reflect that the Debtor owned two 529 plans, one for Julian and one for Chloe.

AO 72A
(Rev. 8/82)

| Date | Julian's 529 Plan | Chloe's 529 Plan | Total |
|---|---|---|---|
| January 1, 2012[3] | $30,038.57 | $35,288.49 | $65,327.06 |
| January 1, 2013 | $34,910.12 | $41,083.96 | $75,994.08 |
| January 1, 2014 | $25,786.95 | $0 | $25,786.95 |
| December 31, 2014 | $0 | $0 | $0 |

(Adv. Dckt. 29, Exs. D, E, F).

On December 10, 2013, the Debtor withdrew $19,112.42 from Julian's 529 Plan[4] and $52,036.73 from Chloe's 529 Plan.[5] These funds were deposited into the Debtor's personal checking account and, according to the Debtor, were used to reimburse herself for the July 25, 2013 Transfer and to fund the December 20, 2013 Transfer. (Adv. Dckt. 29, ¶ 13). However, the total amount withdrawn on December 10, 2013 ($71,149.15) exceeded the combined total of the July 25, 2013 and December 20, 2013 payments ($57,836.00).

Then, on August 18, 2014, the Debtor withdrew the remaining balance of $27,570.72 from Julian's 529 Plan[6] and deposited the funds into her personal checking

---

[3] According to the Debtor, she stopped making contributions to the "plan" (singular) as of January 1, 2012. (Adv. Dckt. 29). Any increase in the funds held in the 529 Plans after that date was derived from investment gains ($10,687.02 gain for calendar year 2012, $20,952.02 gain for calendar year 2013, and $1,818.77 gain for calendar year 2014). *See* Adv. Dckt. 29, Exs. D, E, F.

[4] There is no evidence in the record that the Debtor used any of the funds withdrawn from Julian's 529 Plan to pay for his college expenses. The Debtor's Statement of Financial Affairs does reflect that from October 2013 to June 2014 the Debtor paid $1,800.00 per month for Julian's college expenses, but does not indicate the source of the funds. (Adv. Dckt. 29, Ex. C).

[5] Chloe's 529 Plan was "zeroed-out" as a result of this withdrawal. (Adv. Dckt. 29, Ex. E)

[6] Julian's 529 Plan was "zeroed-out" as a result of this withdrawal. (Adv. Dckt. 29, Ex. F)

AO 72A
(Rev. 8/82)

account. *Id.* According to the Debtor, these funds, in addition to a portion of the funds withdrawn on December 10, 2013, were used to fund the September 2, 2014 Transfer of $29,971.00. (Adv. Dckt. 29, ¶ 14).

D. The Debtor's Financial Situation

In this case, the only evidence of the Debtor's financial condition at the time of the Transfers consists of:

- The Debtor's personal financial statement dated November 13, 2013 (Adv. Dckt. 29, Ex. A);

- The Debtor's 2012 and 2013 federal and state income tax returns (Adv. Dckt. 33, Exs. B and C);

- The Debtor's Chapter 7 bankruptcy petition, schedules and statement of financial affairs (Adv. Dckt. 29, Ex. C);

- A portion of the Debtor's bank statements corresponding to the date of each Transfer (Adv. Dckt. 33, Ex. A); and

- The Debtor's Claim Register (12 claims, all of which have exhibits attached).

The Debtor's personal financial statement (the "PFS"), which was prepared by the Debtor's accountant reflects the following assets and liabilities as of November 13, 2013, roughly 11 months before she filed for bankruptcy:

| Assets | | | Liabilities | | |
|---|---|---:|---|---|---:|
| Cash: | $ | 30,000.00 | Real Estate Mortgages: | $ | 1,779,000.00 |
| 401(k): | $ | 304,000.00 | Other: | $ | 306,416.00 |
| Telfair Place Property: | $ | 1,200,000.00 | | | |
| 70th Street Property: | $ | 1,157,500.00 | | | |
| Personal Property: | $ | 92,675.00 | | | |

| | | | |
|---|---|---|---|
| True Balance MD, PC: | $ 1,400,000.00 | | |
| **Total:** | **$ 4,601,675.00** | **Total:** | **$ 2,085,416.00** |

(Adv. Dckt. 29, Ex. A). Based on the PFS, the Debtor purportedly had a net worth of $2,516,259.00 as of November 13, 2013.

       The Debtor's financial condition began to deteriorate when her medical practices experienced an acute decline in cash flow. (Adv. Dckt. 29, ¶ 9). This decline is reflected in a comparison of the Debtor's 2012 and 2013 federal income tax returns. In 2012, the Debtor reported an adjusted gross income of $1,748,486.00. (Adv. Dckt. 29, Ex. A). Of this total, $1,268,080.00 came from income generated by True Balance and $424,000.00 came from the Debtor's "wages, salaries, tips, etc." *Id.* On her 2013 tax return, the Debtor reported an adjusted gross income of only $25,797.00 and an operating loss of $40,347.00 for True Balance. *Id.*

       As of the petition date, October 28, 2014, the Debtor had an estimated year-to-date income of $142,614.00[7]. (Adv. Dckt. 29, Ex. C). However, as of that same date, the Debtor was unemployed, had a monthly net income of only $1,500.00 "from rental property and from operating a business, profession, or farm" and was seeking a job in Atlanta, Georgia. *Id.* Further, the Debtor's bankruptcy schedules demonstrate that as of the petition date, the Debtor's liabilities ($2,707,653.50[8]) exceeded her assets ($1,137,891.00) by

---

[7] This figure was provided by the Debtor in her Statement of Financial Affairs. The Court has not been provided with the Debtor's 2014 tax returns.

[8] Of these debts, nearly $1,500,00.00 are listed as either contingent, unliquidated or disputed.

$1,569,762.10. (Adv. Dckt. 29, Ex. C). Most notably, the Debtor's schedules reflect that, as of the petition date, the Debtor no longer held an ownership interest in the 70th Street Property ($1,575,000.00 value per the PFS) and listed a $0.00 value for her ownership interest in True Balance ($1,400,000.00 value per the PFS). *Id.*

## III. ANALYSIS

In this case, the Trustee is seeking to avoid the three Transfers made by the Debtor to Skidmore. The Court must analyze each of the payments individually when determining whether Skidmore is entitled to summary judgment. The Court finds that Skidmore is entitled to summary judgment as to the July 25, 2013 and December 20, 2013 Transfers, but not as to the September 2, 2014 Transfer.

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* at 248. The party moving for summary judgment has "the initial responsibility of informing . . . the court of the basis for its motion" and demonstrating the absence of a genuine issue of material fact. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991). What is required of the moving party, however, depends on whether the moving party has the ultimate burden of proof on the issue at trial.

> When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim' (citations omitted) in order to discharge this 'initial responsibility.' Instead, the moving party simply may 'show – that is, point out to the . . . court – that there is an absence of evidence to support the nonmoving party's case. (citations omitted). Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.

*Four Parcels*, 941 F.2d at 1437 (citing *Celotex*, 477 U.S. at 323-31).

Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. Fed. R. Civ. P. 56(e). Rather, the nonmoving party must present specific facts that demonstrate there is a genuine dispute over material facts. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). When reviewing a motion for summary judgment, a court must examine the evidence in the light most favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in favor of the nonmoving party. *Id.*

### B. Avoidance Pursuant to 11 U.S.C. § 548(a)(1)(B)

In this adversary proceeding, the Trustee alleges that each of the Transfers to Skidmore is avoidable as a fraudulent transfer under the following provisions of 11 U.S.C. § 548(a)(1)(B):

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> (B)(I) received less than a reasonably equivalent value in exchange for such transfer . . .; and
>
> (ii)(I) was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer . . .;

11 U.S.C. § 548(a)(1)(B)(i)-(ii)(I). In other words, § 548(a)(1)(B) requires the Trustee to

AO 72A
(Rev. 8/82)

establish, with respect to each Transfer, that: 1) the Debtor transferred "an interest of the debtor in property" to Skidmore within the two-year reach back period[9]; 2) the Debtor "received less than a reasonably equivalent value" in exchange for the Transfer; and 3) the Debtor was insolvent on the date the Transfer was made or became insolvent as a result of the Transfer.

At trial, the Trustee would have the burden of proving each of these elements by a preponderance of the evidence. *In re Holloway*, 2015 WL 1545376, *7 (Bankr. S.D. Ga. Mar. 31, 2015). Thus, to survive summary judgment, the Trustee must point to specific evidence in the record which demonstrates that a genuine issue of material fact exists as to each element of his fraudulent transfer claims. Further, the Trustee must do so with respect to each of the Transfers.

C. Interest of the Debtor in Property

The threshold issue in a § 548 fraudulent transfer action is whether the transfer at issue is "a transfer of an interest of the debtor in property." *See Wallace v. McFarland (In re McFarland)*, 619 Fed. Appx. 962, 967 (11th Cir. 2015). Although not defined by the Bankruptcy Code, courts generally look to the Code's definition of "property of the estate" when determining what constitutes "an interest of the debtor in property." Under section 541(a)(1) "property of the estate" is defined broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case." In *Begier*, the Supreme Court found the phrase "interest of the debtor in property" to be coextensive with "interests of the

---

[9] All three Payments were made within two years of October 28, 2014, the date of the filing of the Debtor's Chapter 7 petition.

debtor in property" as that term is used in 11 U.S.C. § 541(a)(1)[10]. *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 59 (1990). Accordingly, the Supreme Court held the phrase "an interest of the debtor in property" is best understood as "that property that would have been part of the [bankruptcy] estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier*, 496 U.S. at 58.

In this case, the parties dispute whether the funds transferred to Skidmore by the Debtor would have been included in the Debtor's bankruptcy estate had the Transfers not occurred. At first glance, the answer to this question would appear to be a simple one. Had the Transfers not occurred, the funds transferred to Skidmore arguably would have remained in the Debtor's checking account and become property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1).

Skidmore argues, however, that the particular funds it received consisted of the funds withdrawn from the Debtor's 529 Plans. Accordingly, Skidmore asserts that had the Transfers not occurred the funds would have remained in the 529 Plans and would have been excluded from the Debtor's bankruptcy estate pursuant to section § 541(b)(6) of the Bankruptcy Code, which provides, in relevant part:

(b) Property of the estate does not include –

\*                    \*                    \*

(6) funds used to purchase a tuition credit or certificate or contributed to an account in accordance with section 529(b)(1)(A) of the Internal Revenue Code of 1986 under

---

[10]The *Begier* case involved a preference action under 11 U.S.C. § 547. Because § 548 also makes reference to "an interest of the debtor in property", courts have routinely applied the Supreme Court's reasoning in *Begier* to fraudulent transfer actions. *See, e.g. In re Cannon*, 277 F.3d 838, 849 (6th Cir.2002).

AO 72A
(Rev. 8/82)

a qualified State tuition program (as defined in section 529(b)(1) of such Code) not later than 365 days before the date of the filing of the petition in a case under this title, but–

> (A) only if the designated beneficiary of the amounts paid or contributed to such tuition program was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were paid or contributed;
>
> (B) with respect to the aggregate amount paid or contributed to such program having the same designated beneficiary, only so much of such amount as does not exceed the total contributions permitted under section 529(b)(7) of such Code with respect to such beneficiary . . .; and
>
> (C) in the case of funds paid or contributed to such program having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,225[.][11]

11 U.S.C. § 541(b)(6).

Skidmore acknowledges that the Debtor transferred the funds from her checking account, but argues that the checking account served merely as a convenient method of forwarding to Skidmore the funds withdrawn from the 529 Plans. (Adv. Dckt. 35, ¶ 26). Further, Skidmore asserts that the Debtor has expressly stated, and a simple exercise in tracing confirms, that she withdrew funds from the 529 Plan for the purpose of funding the payments to Skidmore. The Trustee urges, however, that whether or not the Debtor withdrew funds from the 529 Plans to pay Skidmore is irrelevant because such funds would have lost their exclusion from "property of the estate" under § 541(b)(6) at the moment they were commingled with other funds in the Debtor's checking account. (Adv. Dckt. 33, p. 6).

The court does not find the Trustee's argument on this latter point persuasive. No

---

[11] Section 541(b)(6) excludes 529 plan funds on a "sliding scale" based on the proximity in time of the contributions to the filing of the bankruptcy. Here, the Debtor stopped making contributions on or before January 1, 2012. Thus, all of the funds in the Debtor's 529 Plans would have been excluded from "property of the estate" had they not been withdrawn.

provision in 26 U.S.C. § 529 requires a taxpayer to pay for qualified educational expenses directly from the 529 plan itself. In fact, the IRS has recognized that taxpayers often pay for a qualified educational expense from another source (e.g. a bank account) and then withdraw funds from the 529 plan as a reimbursement for such expense[12]. Further, the express language of 11 U.S.C. § 541(b)(6) does not limit the exclusion from property of the estate to the 529 plan itself, but rather the "funds contributed to" the 529 plan. Thus, if the funds in the Debtor's checking account can be traced to the 529 Plans, then arguably they would still be entitled to their exclusion from "property of the estate" under § 541(b)(6). *Cf. In re Fraley*, 148 B.R. 635 (Bankr. M.D. Fla. 1992) (finding, for purposes of 11 U.S.C. § 522, that traceable proceeds of a lump sum settlement in a workers' compensation case retained their exempt status, despite having been placed into a checking account).

Based on the provisions of 26 U.S.C. § 529 and the express language of 11 U.S.C. § 541(b)(6), the Court finds the fact that Debtor commingled the funds withdrawn from the 529 Plans with the funds in her checking account is not determinative of whether the funds transferred to Skidmore would have been excluded from "property of the estate" under §

---

[12]In March of 2008, the IRS published an announcement acknowledging that § 529 is silent regarding whether distributions must be made from a section 529 account in the same tax year as the qualified educational expense was paid or incurred. *Guidance on Qualified Tuition Programs Under Section 529*, Internal Revenue Bulletin: 2008-9, Announcement 2008-17 (March 3, 2008). Further, the IRS proposed to "adopt a rule that, in order for earnings to be excluded from income, any distribution from a section 529 account during a calendar year must be used to pay [qualified educational expenses] during the same calendar year or by March 31 of the following year." *Id.* Thus, if the rule had been adopted, it appears the IRS would have allowed taxpayers to take advantage of the favorable tax treatment by either "reimbursing" themselves from the 529 plan after advancing the funds to pay for qualified educational expenses or withdrawing funds from the 529 plan to pay for qualified educational expenses in the same year.

541(b)(6) had the Transfers not occurred. Instead, whether the funds transferred to Skidmore would have been excluded from "property of the estate" depends on whether such funds can be adequately traced to the Debtor's 529 Plans. Thus, to be entitled to summary judgment on the basis that the Transfers were not "transfer[s] of an interest of the debtor in property," Skidmore must point to specific evidence in the record which demonstrates that no genuine issue of material fact exists regarding whether the funds transferred to Skidmore can be traced to the Debtor's 529 Plans[13]. The Court finds that Skidmore has failed to meet such burden with respect to each of the Transfers.

### i. The July 25, 2013 Transfer

Based on the limited evidence in the record, the Court is unable to determine, for purposes of summary judgment, that the July 2013 Transfer was not "a transfer of an interest of the debtor in property" based on the exclusion of 529 funds under 11 U.S.C. § 541(b)(6). The Debtor did not withdraw any funds from the 529 Plans until December 10, 2013, which was nearly 140 days after the July 2013 Transfer. Thus, it cannot be said that any of the funds received by Skidmore out of the Debtor's checking account on July 25, 2013 were funds from the Debtor's 529 Plans.

Skidmore argues, however, that the July 25, 2013 Transfer was "funded" by the 529 Plans because the Debtor later reimbursed herself for such payment with funds from the 529

---

[13] Because it is undisputed that the Debtor paid Skidmore from her personal checking account, as opposed to the 529 Plans themselves, Skidmore bears the burden of tracing the particular funds it received to the 529 Plans. *See In re R.W. Leet Electric, Inc.*, 372 B.R. 846 (6th Cir. BAP 2007) (preference defendant, not the trustee, had burden of tracing challenged payments to funds debtor-contractor held in trust).

Plans[14]. To support this argument, Skidmore relies on the Debtor's Declaration in which she states that the December 10, 2013 withdrawal was made for the express purpose of reimbursing herself for the July 25, 2013 Transfer. While this may be true, the Court finds the Debtor's Declaration alone insufficient[15].

As the account owner, the Debtor could have lawfully used the funds from the 529 Plans for any purpose, including the payment of living expenses. The only consequence of such non-educational use of the funds would be the tax treatment of those withdrawals. The only evidence in the record of the Debtor's other income and expenses during the 140-day period between the July 25, 2013 Transfer and the December 10, 2013 reimbursement consists of a single page of the Debtor's July 2013 bank statement, which reflects only the amounts of 11 checks (totaling $9,413.00) and debits totaling $39,766.14 (including the $29,233.00 payment to Skidmore). Further, the one page statement does not reflect the beginning or ending balances of the account. More to the point, the Debtor's income and expenses for the entire 140-day period is not in the record. When the Debtor moved the funds from the 529 Plans into her checking account on December 10, 2013, they were presumably used to pay other expenses.

Without such evidence, the Court cannot determine, for purposes of summary

---

[14]As discussed in footnote 11, for purposes of 26 U.S.C. § 529, it appears that it is not improper for a taxpayer to withdraw funds from a 529 Plan to reimburse himself for qualified educational expenses. However, the tax treatment of the withdrawals does not answer the question of whether the funds can be traced to the 529 Plans for purposes of the exclusion under § 541(b)(6).

[15]Generally, a party's state of mind (such as intent) is a question of fact for the factfinder to be determined at trial. *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 932 F.2d 1472, 1476 (11th Cir. 1991).

SAO 72A
(Rev. 8/82)

judgment, that the Debtor did in fact use the 529 funds withdrawn on December 10, 2013 to the reimburse herself for the July 25, 2013 Transfer, as opposed to other non-educational expenses. Accordingly, Skidmore is not entitled to summary judgment on the basis that the July 25, 2013 Transfer was not "a transfer of an interest of the debtor in property."

### ii. The December 20, 2013 Transfer

As previously mentioned, the Debtor withdrew a total of $71,149.15 from Chloe and Julian's 529 accounts on December 10, 2013. Skidmore asserts that the $28,603.00 it received from the Debtor on December 20, 2013 were comprised of funds from the 529 Plans. Skidmore again relies solely on the Debtor's Declaration to support its argument. In her Declaration, the Debtor states that she used a portion of the funds withdrawn from the 529 Plans on December 10, 2013 for the purpose of funding the December 20, 2013 Transfer.

Based on such a short lapse in time (10 days), one could reasonably infer that the funds withdrawn from the 529 Plans on December 10, 2013 were used to pay Skidmore. However, for the same reasons with regard to the July 2013 Transfer, the evidence in this case is insufficient to conclude as a matter of law that the Debtor used the 529 Plan funds withdrawn on December 10, 2013 to fund the December 20, 2013 Transfer. The record contains only one page of the Debtor's December 2013 bank statement, which reflects the amounts of 17 checks (totaling $9,773.60) and debits totaling $30,268.33 (including the $28,603.00 payment to Skidmore). Without evidence of the Debtor's other income and expenses before, during and after the 10-day period, the Court is unable to sufficiently "trace" the funds withdrawn from the 529 Plans to the funds transferred to Skidmore. Accordingly,

Skidmore is not entitled to summary judgment on the basis that the December 20, 2013 Transfer was not "a transfer of an interest of the debtor in property."

### iii. The September 2, 2014 Transfer

Skidmore also relies on the Debtor's Declaration to demonstrate that the September 2, 2014 Transfer was funded by the Debtor's 529 Plans. According to the Debtor, she used the entirety of the August 18, 2014 withdrawal ($27,570.72) and a portion of the December 10, 2013 withdrawal ($2,400.28) to pay Skidmore a total of $29,971.00 on September 2, 2014. Again, the only evidence of the Debtor's other income and expenses between the time of the December 10, 2013 and August 18, 2014 withdrawals and the September 2, 2014 payment to Skidmore (266 days and 15 days, respectively) consists of a single page of the Debtor's September 2014 bank statement. This one-page statement reflects only the amounts of eight (8) debits totaling $30,373.16 (including the $29,971.00 payment to Skidmore). As with the first two transfers, the Court is unable to "trace" the 529 Plan funds to the funds transferred to Skidmore, and thus cannot conclude, for purposes of summary judgment, that the Debtor did in fact use the 529 funds withdrawn on December 10, 2013 and August 18, 2014 to fund the September 2, 2014 Transfer. Accordingly, Skidmore is not entitled to summary judgment on the basis that the September 2, 2014 Transfer was not "a transfer of an interest of the debtor in property."

### D. Reasonably Equivalent Value

In order to succeed on his fraudulent transfer claims, the Trustee must show that the Debtor did not receive "reasonably equivalent value" in exchange for the Transfers. 11

U.S.C. § 548(a)(1)(B)(I). Section 548(d) of the Bankruptcy Codes defines "value," as:

> (2) In this section –
>
>  (A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor;

11 U.S.C. § 548(d)(2)(A). Courts generally construe this definition of "value" broadly. *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 163 (5th Cir. 2015). In keeping with this broad understanding of value, the test that the Eleventh Circuit has applied to determine "reasonably equivalent value" is whether the transfer "confers an economic benefit upon the debtor, either directly or indirectly." *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990).

In this case, it is undisputed that the Transfers to Skidmore paid for the tuition and costs of attendance of the Debtor's daughter, Chloe. Thus, the "value" in exchange for the Debtor making tuition payments went directly to Chloe, who was able to attend and receive a college education. Skidmore argues, however, that the Debtor also received "value" in exchange for the tuition payments. Specifically, Skidmore asserts that the Debtor received an indirect, economic benefit by helping Chloe to achieve financial independence, and thus relieving the Debtor of the need to financially support her in the future[16].

Shortly before the Court held oral argument on the Debtor's Motion, Judge Hoffman published a decision, *In re Palladino*, 556 B.R. 10 (Bankr. D. Mass. August 10,

---

[16]While Skidmore contends this provides economic value to the Debtor, it has not provided any evidence from which the Court could quantify this value in any manner. (Adv. Dckt. 28, ¶ 17).

2016), in which he discusses, in depth, whether a parent receives "reasonably equivalent value" in exchange for the payment of an adult child's college tuition. In his decision, Judge Hoffman recognizes that bankruptcy trustees have previously brought lawsuits to recover college tuition payments made by a parent for a child, but notes that prior decisions offer "conflicting guidance." *Id.* at 15. Some Courts have rejected a trustee's efforts to avoid and recover tuition payments finding that such payments provide "reasonably equivalent value" to the debtor-parent because they are essential to maintaining the family unit. *Sikirica v. Cohen (In re Cohen)*, 2012 WL 5360956 at *10 (Bankr. W.D. Pa. 2012) ("[w]hile the Pennsylvania legislature has not yet enacted a statute that requires parents to pay for their children's post-secondary education, this Court holds that such expenses are reasonable and necessary for the maintenance of the Debtor's family. . ."); *Shearer v. Oberdick (In re Oberdick)*, 490 B.R. 687, 712 (Bankr. W.D. Pa. 2013) ("there is something of a societal expectation that parents will assist with such expenses if they are able to do so."). Other courts have found that tuition payments may be avoided by a trustee because the benefit parents receive in exchange for paying for their child's college education is not economic, concrete, or quantifiable, and thus cannot be considered "value." *See Gold v. Marquette Univ. (In re Leonard)*, 454 B.R. 444, 457 (Bankr. E.D. Mich. 2011) (finding a parent's moral obligation to help pay for their child's college education may bestow "peace of mind" on a parent, but such a benefit is not economic, concrete or quantifiable);

Ultimately, Judge Hoffman reaches the conclusion that a parent does receive "reasonably equivalent value" in exchange for the payment of an adult child's college tuition:

> I find that the [parents] paid [Sacred Heart University] because they believed that a financially self-sufficient daughter offered them an economic benefit and that a college degree would directly contribute to financial self-sufficiency. I find that motivation to be concrete and quantifiable enough. The operative standard used in both the Bankruptcy Code and the UFTA is "reasonably equivalent value." The emphasis should be on "reasonably." Often a parent will not know at the time she pays a bill, whether for herself or for her child, if the medical procedure, the music lesson, or the college fee will turn out to have been "worth it." But future outcome cannot be the standard for determining whether one receives reasonably equivalent value at the time of a payment. A parent can reasonably assume that paying for a child to obtain an undergraduate degree will enhance the financial well-being of the child which in turn will confer an economic benefit on the parent. This, it seems to me, constitutes a *quid pro quo* that is reasonable and reasonable equivalence is all that is required.

*Palladino*, 556 B.R. at 10.

Respectfully, I reach the opposite conclusion. The Court recognizes that the Debtor may have felt a moral obligation to pay for Chloe's college education and help her to achieve financial independence. However, I find that the satisfaction of such moral obligation does not provide an "economic" benefit to the Debtor. By paying for her daughter's tuition, the Debtor did not discharge or satisfy any legal duty or obligation to do so[17], nor did she increase her assets in any way that could be used to pay her creditors. Because Skidmore has not provided any evidence of an "economic" benefit conferred on the Debtor, it is not entitled to summary judgment as to any of the Transfers on the basis that the Debtor received "reasonably equivalent value" in exchange for the Transfers.

E. The Debtor's Insolvency

Under 11 U.S.C. § 548(a)(1)(B), the Trustee has the burden of affirmatively

---

[17] Under Georgia law, the Debtor has no legal duty to pay for her adult child's college education. O.C.G.A. § 19-7-2 provides that, "[i]t is the joint and several duty of each parent to provide for the maintenance, protection, and education of his or her own child until the child reaches the age of majority, dies, marries or becomes emancipated, whichever first occurs . . ." The legal age of majority in Georgia is eighteen (18) years. O.C.G.A. § 39-1-1.

proving at trial that each transfer to Skidmore occurred while the Debtor was insolvent or the Debtor became insolvent as a result of the transfer.[18] *In re Holloway*, 2015 WL 154376 at \*9 (Bankr. S.D. Ga. Mar. 31, 2015)(J. Barrett) (unlike a § 547 preference action, there is no rebuttable presumption of insolvency in an action to recover a constructively fraudulent transfer). Because the Trustee has the burden of proving the Debtor's insolvency at trial, he must demonstrate that a genuine issue of material fact exists regarding the Debtor's solvency at the time of each Transfer to survive summary judgment. The Court finds that the Trustee has failed to establish that a genuine issue of material fact exists as to the Debtor's solvency at the time of the July 25, 2013 and December 20, 2013 Transfers. However, the Court finds that a genuine issue of material fact exists regarding the Debtor's solvency at the time of the September 2, 2014 Transfer.

### i. The July 25, 2013 and December 20, 2013 Transfers

The Trustee first argues that Debtor's decline in income from 2012 to 2013 creates a genuine issue of material fact as to the Debtor's solvency at the time of July 2013 and December 2013 Transfers. According to the Debtor's federal tax returns, the Debtor experienced a decline in her adjusted gross income from 2012 ($1,748,486.00) to 2013 ($25,797.00). The Trustee contends that such a significant decline in income is a strong indication of the Debtor's overall financial stability, and thus her insolvency, during the time

---

[18]The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of [an individual's] debts is greater than all of such [individual's] property, at a fair valuation, exclusive of – (I) property transferred, concealed, or removed with intent to hinder, delay, or defraud such [individual's] creditors; and (ii) property that may be exempted from property of the estate under section 522 of this title." 11 U.S.C. § 101(32)(A).

AO 72A
(Rev. 8/82)

the Transfers occurred.

The Court finds the Trustee's argument to be misguided. An individual debtor's insolvency is not determined by his or her income, instead the analysis of a debtor's solvency is a "balance sheet test," examining whether the debtor's assets exceed her liabilities. *See Carr v. Loeser (In re Int'l Auction & Appraisal Servs., LLC)*, 2014 Bankr. LEXIS 5294 (Bankr. M.D. Pa. 2014) (finding that the chapter 7 trustee failed to meet his burden of proving insolvency even where the debtor had negative gross income in the year prior to filing for bankruptcy, nothing that "negative adjusted gross income is not the same as insolvency."). It is certainly conceivable that a debtor may experience a decline in income from one year to the next, but nevertheless still have a significant net worth. Accordingly, the Court finds that evidence of the Debtor's decline in income, without more, is insufficient to create a genuine issue of material fact as to the Debtor's solvency at the time of the July 25, 2013 and December 20, 2013 Transfers.

The Trustee argues that the Debtor's bankruptcy schedules provide further evidence of the Debtor's insolvency at the time of the July 25, 2013 and December 20, 2013 Transfers. However, the Debtor's bankruptcy schedules provide only a snapshot of the Debtor's assets and liabilities as of October 28, 2014, the petition date. While this may provide some evidence of the Debtor's insolvency at the time of the September 2, 2014 Transfer[19] (56 days prior to the petition date), it is insufficient to establish the Debtor's insolvency at the time of

---

[19]The Court finds that the Debtor's bankruptcy schedules, which indicate that her liabilities exceeded her assets, provide sufficient evidence to create a genuine dispute regarding the Debtor's insolvency at the time of the September 2, 2014 Transfer.

the July 25, 2013 Transfer (over 15 months prior the petition date) and the December 20, 2013 Transfer (nearly 10 months prior to the petition date). *In re Strickland*, 230 B.R. 276, 283 (Bankr. E.D. Va. 1999) ("[e]vidence of insolvency on the date of the alleged fraudulent transfer is the critical issue and proof of insolvency on any other date is insufficient"). The Trustee provided no other evidence as to whether the Debtor's liabilities exceeded her assets at the time of the July 25, 2013 or December 20, 2013 Transfers.

Skidmore, however, provided the Court with a personal financial statement signed by the Debtor on November 13, 2013[20]. The PFS reflects that the Debtor had a net worth of $2,516,259.00 as of November 13, 2013, just four months after the July 2013 Transfer and one month prior to the December 2013 Transfer. Accordingly, Skidmore contends that the PFS provides affirmative evidence of the Debtor's solvency at the time of July 25, 2013 and December 20, 2013 Transfers. However, the Trustee argues that the PFS contains several discrepancies which raise concerns regarding its probative value and veracity.

First, the Trustee contends that the PFS inaccurately lists the Debtor's income (Salary, Bonuses & Commissions) as $300,000.00 because the Debtor only reported wages and salaries of $53,846.00 on line 7 of her 2013 tax return.[21] But again, the determination of

---

[20] It is questionable whether the Court should even consider the PFS. In her Declaration (adv. dckt. 29), the Debtor seems to attribute the information in the PFS to the accountant who prepared it. However, since Skidmore prevails on the issue of insolvency even without this evidence of the Debtor's substantial pre-petition net worth, the Court's consideration of the PFS does not harm the Trustee.

[21] The Debtor's tax return reflects an adjusted gross income of $25,797.00 and a taxable income of $0.00 for the year. In addition, the tax return shows a refund due to the Debtor of $22,087.00.

the Debtor's insolvency is simply a test of whether her assets exceeded her liabilities. Thus, even if the Debtor's income was incorrectly stated on the PFS it would be irrelevant to the Court's analysis of the Debtor's solvency.

Second, the Trustee contends that the $1,400,000.00 valuation ascribed to the Debtor's interest in True Balance M.D., PC is excessive because the entity owns no real estate and reported an operating loss of $40,347.00 in 2013. Although there is no evidence of the Debtor's valuation method, it is conceivable that a medical practice could have a positive value despite operating at a loss. Further, even if the Court were to ascribe no value whatsoever to True Balance, the Debtor's remaining assets would have still exceeded her liabilities.

Lastly, the Trustee contends that the PFS overvalues the Debtor's real estate, which are collectively valued at $2,775,000 in the PFS. The Trustee asserts that the real estate should be valued at their assessed value for tax purposes, which was $2,023,900.00 in 2013. (Dckt. 33, Ex. E, F).  Again, even if the Court were to accept the Trustee's proposed valuation of the real estate, in addition to the $0.00 valuation of True Balance, the Debtor's assets still exceeded her debts on November 13, 2013 according to the PFS.[22]

In making all reasonable inferences in favor of the Trustee, as the Court must, the record does not contain sufficient evidence to create a genuine issue of material fact regarding whether the Debtor was insolvent on the date of July 2013 and December 2013

---

[22]After eliminating the $1,400,000 value ascribed to True Balance and reducing the value of the Debtor's real estate to $2,023,900, the Debtor still had a net worth of $365,159.00 as of November 13, 2013.

AO 72A
(Rev. 8/82)

Transfers or became insolvent as a result of these Transfers.

### ii. The September 2, 2014 Transfer

The Trustee contends that the Debtor's bankruptcy schedules, which reflect that the Debtor's liabilities[23] ($2,707,653.50) exceeded her assets ($1,137,891.40) by $1,521,503.06 on October 28, 2014, create a genuine issue of material fact regarding the Debtor's insolvency at the time of the September 2, 2014 Transfer. (Adv. Dckt. 33, p. 3). Without evidence to the contrary, the Court finds it reasonable to infer, for purposes of summary judgment, that the Debtor's financial condition on the petition date, October 28, 2014, was no different than her financial condition on September 2, 2014, just 56 days earlier. *See Parlon v. Claiborne (In re Kaylor Equip. & Rental, Inc.)*, 56 B.R. 58, 62 (Bankr. E.D. Tenn.1985) ("[i]n proving the insolvency of the debtor, a trustee may meet his burden of proof by showing that the debtor was insolvent at a reasonable time subsequent to the date of the alleged transfer, accompanied by proof that no substantial change in the debtor's financial condition occurred during the interval"). In fact, the Debtor's Schedule "E" and "F" indicate that nearly the entirety of the Debtor's liabilities were incurred prior to September 2, 2014. As to the value of the Debtor's assets, the Court likewise infers that there were no

_____

[23]Skidmore argues that virtually all of the liabilities listed on the Debtor's bankruptcy schedules are scheduled as contingent, unliquidated or disputed and must be discounted, if not omitted, from any solvency analysis. *See In re Sportman's Link*, Inc., 2011 Bankr. LEXIS 2588 ("a contingent liability may be included in an insolvency analysis, but in order to value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real"). While this may be true, the Court has not been provided with any evidence from which to "discount" such liabilities. Because the Court must construe all evidence in a light most favorable to the Trustee, the Court will assume that the Debtor accurately valued the claims listed in her schedules.

substantial changes in value during the 56-day period. Accordingly, the Court finds that the Trustee has met his burden in demonstrating that a genuine issue of material fact exists regarding the Debtor's solvency at the time of the September 2, 2014 Transfer.

## IV. CONCLUSION

In his Complaint, the Trustee alleges that each Transfer to Skidmore is avoidable as a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B). Skidmore filed the instant Motion seeking summary judgment on each of the Trustee's fraudulent transfer claims based on the Trustee's failure to establish, with respect to each Transfer, that: 1) the Debtor transferred an "interest of the Debtor in property"; 2) the Debtor received less than reasonably "equivalent value" in exchange for the transfer; and 3) the Debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer. Accordingly, to survive summary judgment, the Trustee has the burden of pointing to specific evidence in the record which demonstrates that a genuine issue of material fact exists as to each of these elements of his fraudulent transfer claims.

Based on the foregoing, the Court finds that a genuine issue of material fact exists as to each element of the Trustee' fraudulent transfer claim as it relates to the September 2, 2014 Transfer. However, the Court finds that the Trustee failed to demonstrate that a genuine issue of material fact exists as to the Debtor's solvency at the time of the July 25, 2013 and December 20, 2013 Transfers. Accordingly, the Court will enter a separate order DENYING Skidmore's Motion for Summary Judgment as to the September 2, 2014 Transfer and GRANTING Skidmore's Motion for Summary Judgment as to the July 25, 2013 and

December 20, 2013 Transfers.


Dated at Savannah, Georgia, this 7th day of February, 2017.


Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia